Rhea H. OWENS, Appellant,

v.

Grover C. RIDGEWAY, Jr., and Malcolm L. Morrison, Appellees.

No. 7478.

Court of Civil Appeals of Texas.

Amarillo.

Sept. 13, 1965.

Rehearing Denied Oct. 11, 1965.

Stone & Stone, Amarillo, for appellant.

Carnahan & Fields, Amarillo, for appellees.

CHAPMAN, Justice.

This is an appeal by Rhea H. Owens from an instructed verdict in a suit to cancel and rescind two assignments of oil and gas leases to him by defendants below, Grover C. Ridgeway, Jr., and Malcolm L. Morrison, of ¾ of their 8/8 working interest therein to specified depths in the oil and gas leases on two sections of land in Beaver County, Oklahoma, described as Sections 8 and 17, Township 6 North, Range 22 E.C.M. upon which is situated a gas well known as Taylor No. 1. The parties will be referred to as in the court below.

Plaintiff Owens alleged that defendants personally and through their duly authorized agent, David L. Whatley, represented to him as a fact that such well was producing 600 M.C.F. of gas per day without diminution of the flowing pressure, and condensate at the rate of five barrels per 1000 M.C.F.; that in reliance upon such representations he entered into a contract on July 19, 1962, with defendants for the purchase of ½ of their working interest in such leases and well for the consideration of $28,000.00; that thereafter Mr. Morri-son, for himself and Mr. Ridgeway, negotiated with plaintiff for the sale of an additional ¼ of their working interest in such leases and well, representing to plaintiff as a fact that daily production of such well "was holding up," and that it could produce 1000 M.C.F. of gas per day without bad effect; that after such representations, defendants on November 9, 1962, executed and delivered to him an assignment of ¼ of their working interest for which he paid defendants $6,000.00 in cash; that said well never at any time had a daily production of 600 M.C.F. of gas per day, never produced condensate at the rate of five barrels per 1000 M.C.F. of gas per day; that two weeks prior to July 19, 1962, the well had a daily production of less than 1000 M.C.F. of gas per day and never produced the represented amount of condensate; that plaintiff has never received any proceeds whatever from any production of such well and the working interests therein transferred and assigned by defendants to plaintiff have no value whatever; that all such representations were false and untrue at the time they were made; that they were made with the intent to induce plaintiff to make such purchases; that they were representations of material facts; that plaintiff relied on such representations believing them to be true, and was induced thereby to purchase the ¾ working interest from defendants; that such false representations made by defendants and their agent, Whatley, were made with their knowledge that such representations were untrue and made with the intent to deceive or mislead plaintiff.

After the testimony was closed and a motion made by defendants for an instructed verdict, plaintiff was permitted to file the following trial amendments:

"NOW COMES, the plaintiff, Rhea H. Owens, and herewith tenders to the defendants in this cause a reassignment of all of the interests assigned by the defendants to the plaintiff described in the Plaintiff's Original Petition and binds himself to do all things necessary

to do complete equity herein as finally determined by the Court."

From the judgment based upon the instructed verdict plaintiff has appealed upon the one point of error in the trial court instructing the jury to return a verdict against plaintiff in favor of defendants.

We believe there is more than a scintilla of evidence to raise fact issues in the case and that the trial court was in error in not permitting the jury to pass upon them.

If there is any relevant evidence of probative value, a fact issue is raised and a directed verdict is improper. Texas Law Review, Vol. 22, p. 359. "This is a corollary of the constitutional guarantee of trial by jury in TEX.CONST. Art. I, Sec. 15." Id.; Buckholts State Bank v. Graf, Tex. Civ.App., 200 S.W. 858 (N.W.H.). Likewise, a strong preponderance of the evidence on one side or the other is not sufficient to justify a trial court in denying the right to trial by jury. Drew v. American Automobile Ins. Co., Tex.Civ.App., 207 S.W. 547 (N.W.H.).

"In determining in any case whether or not error has been committed by a trial court in instructing a verdict, the testimony must be considered in the light most favorable to the losing party. Conflicts in the testimony must be disregarded, and every intendment reasonably deducible from the evidence must be indulged in favor of such party and against the verdict." Anglin v. Cisco Mortg. Loan Co., 135 Tex. 188, 141 S.W.2d 935.

With respect to the tesimony given by plaintiff concerning representations made by defendants or their agent, Mr. Whatley, as to the production of the well the record shows as follows:

"Q. All right—now, did you have another conversation with Mr. Whatley a few days later?

A. It was some days later—it was a day or two before—

Q. Well, let me go back a little. Did Mr. Whatley say anything about where he got his information?

A. *Not at that time. Not on this occasion we are referring to.*

Q. State whether or not he said that an employee of Morrison's office had called Panhandle Eastern?

A. *That is as I recall it, on a subsequent date to this first date we are talking about.*

\*    \*    \*    \*    \*    \*

A. \* \* \* So then, Mr. Hatton spoke up and asked him, says, 'Now, Cotton, what is it doing to the pressure?' And he says, 'Well, the pressure is holding up fine.'

\*    \*    \*    \*    \*    \*

Q. Now, it was after he told you it was still producing six hundred thousand cubic feet a day, and the pressure was holding up, that you first became interested in buying an interest in the well?

A. That is right.

\*    \*    \*    \*    \*    \*

Q. When was the next time you heard from Mr. Whatley?

A. It was on the 19th, the date that we, ·that the deal was actually escrowed.

Q. Did he call you or did you call him?

A. He called me by telephone.

Q. That morning, was it?

A. I don't remember exactly; I would say around noon.

Q. What did he say?

A. He said that Ridgeway and Morrison want to escrow that deal; says, 'if you want it, you go up to Neal, an attorney by name of Neal's office.' Says, 'If you don't, they are going to sell it to somebody else.'

Q. Did you ask him anything about the production at that point?

A. I says, 'What is the production doing now?' He says, 'It is still holding to six hundred thousand cubic feet a day.'

Q. Now, Mr. Owens, what was said during these conversations about the condensate?

A. The general talk was that it would yield from four to eight barrels per million cubic feet. Whatley's talk seemed to center on five barrels per million cubic feet.

Q. Well, did he ever actually tell you it was actually producing five barrels per million cubic feet, per day?

A. That's right, he did.

Q. On how many occasions?

A. At least three occasions—well, I wouldn't say exactly, because on the telephone I don't think he repeated about the condensate.

Q. But at least on two occasions he talked about it?

A. Yes, at least two occasions.

Q. In addition to saying it was producing six hundred thousand cubic feet of gas a day, he also said it was producing five barrels of condensate per million cubic feet?

A. That's right."

All italics herein are ours.

With respect to the second purchase of the ¼ of the working interest plaintiff testified as follows concerning the representations made to him by defendant Morrison:

"A. * * * He talked at length, and I told him, I says, 'Now, Whatley told me before I bought that half that that well was delivering six hundred thousand cubic feet a day.' I says, 'Is it delivering that much?' So he went to a large sheet of paper on a tripod, I call it, or an easel, and began figuring; and he figured at length and he came up with, he says, 'Well, I tell you what it will deliver every year,'—he says, 'It will deliver a hundred fifteen million cubic feet; and he figured that out at 17¢ per thousand, or $170 per million, and it came out with eighteen thousand dollars, plus; and then he says, 'Well, it will bring out about six or eight barrels of distillate a day,' or words to that effect. He used the figure of six, I mean six barrels per million cubic feet, and he extended that out at a net value of two dollars and fifty cents per barrel, and came up with, I believe, seventeen hundred and some odd dollars; and those two figures there together were something about or a little above twenty thousand dollars. He says, 'I know this well, I know the wells around it, and you can depend on that much per year. And I asked him then, I says, 'Well, if it is that good why would you want to sell it', at the price he had offered. He said, 'I have just acquired a bunch of leases up near Farnsworth, in the Texas Panhandle, and in order to get those leases I had to agree to drill a well on each lease every ninety days, and I am just pinched for money right now, and this money will make me more in those leases than it will in this gas well.' "

██ Though the agent, Mr. Whatley, made some statements in the record indicating they were made as merely the communication to plaintiff from another person, it is obvious that some of the material statements by him were affirmative representations of a fact. The statements of defendant Morrison just quoted were also clearly affirmative representations.

Our Supreme Court in Boles v. Aldridge, 107 Tex. 209, 175 S.W. 1052, has said:

"The positive affirmation of the truthfulness of information, upon

which it is stated that a representation of fact is made, clearly amounts to an affirmation of the truthfulness of the representation itself. *The inquiry in all such cases is not whether the party making the representation has actual knowledge, but whether the statement is made as one of fact and purports to be the truth.*

\* \* \* \* \* \*

"The rule is fully recognized that what one states to another merely as his information touching the subject of a transaction will not support an action for rescission, *if such was in fact the information received,* though in fact it was untrue."

The record shows without question that the well was not still producing 600 M.C.F. of gas per day "about the 25th, 26th and 27th of June, 1962," nor did it ever produce that much in any one day. It is without dispute in the record that it also never produced the amount of condensate defendants and their agent represented it would produce and was producing.

■ It is doubtful that the pleadings of plaintiff were sufficient for a rescission until the trial amendment was allowed but with that amendment he tendered a reassignment of all the interest assigned by the defendants to him and bound himself to do all things necessary to do complete equity.

■ Defendants contend plaintiff did not offer to refund the amount he had received from the well but the record shows Panhandle Eastern was holding in suspense all the production represented by plaintiff's interest and that he offered to do complete equity.

■ Defendants also contend that a tender of reconveyance of real property in another state is insufficient for the reason that a court may not "by its decree affect title to land situated in another jurisdiction," citing Paul v. Chenault, Tex.Civ. App., 44 S.W. 682 (N.W.H.).

That case is not in point with the instant case on the facts. That case in an obiter dictum statement held the court in Texas had no power to "affect by its decree the title to land" in Tennessee. Our Supreme Court in the case of Morris v. Hand, 70 Tex. 481, 8 S.W. 210, has held:

"\* \* \* courts of one state or county have no authority \* \* \* to divest the title to real estate situated in a foreign state or country, \* \* \* *the extent of the power in such cases being to decree that the person invested with the title make conveyance of it, which may be enforced by personal process against the owner. But the decree is not effectual unless the owner of the land in person executes a conveyance to it."*

Here the owner of the leases has offered to do so by tendering "to the defendants in this cause a reassignment of all interests assigned by the defendants to the plaintiff \* \* \*" and binds himself to do all things necessary to do complete equity, since the receiving pipeline company has held in suspense all plaintiff's interest from production.

In speaking of the rule that "He who seeks equity must do equity," the author in Pomeroy's Equity Jurisprudence, Second Edition at p. 525, has said:

"\* \* \* It says, in effect, that the court will give the plaintiff the relief to which he is entitled, only upon condition that he has given, *or consents to give,* the defendant such corresponding rights as he also may be entitled to in respect of the subject-matter of the suit. \* \* \*"

The trial court had jurisdiction of the parties and could certainly have decreed that defendants were entitled to the production held in suspense by the pipeline company awaiting the decree of the court to determine to whom it should be paid.

■■ It has been settled by our courts that cancellation is an equitable remedy.

City of Dallas v. Wright, 120 Tex. 190, 36 S.W.2d 973, 77 A.L.R. 709. The record as finally made here is sufficient to entitle plaintiff to that remedy and to give him an opportunity to have a fact-finding body pass on the facts of the case.

Accordingly, the judgment of the trial court is reversed and remanded for a trial upon the fact issues.